# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| HARTFORD FIRE INSURANCE CO., ) | |
| ) | |
| ) | Case No. 04 C 5523 |
| Plaintiff/Counter-Defendant, ) | |
| v. ) | Judge Blanche M. Manning |
| ) | |
| A. BLOCK MARKETING, INC., ) | |
| ) | |
| Defendant/Counter-Plaintiff. ) | |

## MEMORANDUM AND ORDER

Plaintiff/Counter-Defendant Hartford Fire Insurance Co. ("Hartford") brought the instant action seeking a declaration of its rights and obligations under a terminal liability insurance Policy ("the Policy") which named Defendant/Counter-Plaintiff A. Block Marketing, Inc. ("Block") as the insured. The present matter comes before this Court on the parties' Cross Motions for Summary Judgment.[1] For the reasons set forth herein, the Court GRANTS Hartford's motion and DENIES Block's motion.

---

[1] The Policy provided coverage "for damage to barges and cargo in the care and custody of the insured while at the Terminal."

# BACKGROUND[2]

This action stems from two events: (1) the issuance of a Policy listing Block as the "named insured" (with no other additional insureds); and (2) a separate action by Cargo Carriers ("CC"), brought prior to the instant case, alleging that Wholesale Mulch Products, Inc. ("Wholesale") and Barge Terminal Trucking, Inc. ("BTT") damaged several barges owned by CC ("the CC Action") while unloading road salt at a shipping terminal in Lemont, Illinois ("the Terminal").

**Block and Wholesale**

After allegedly first learning of the CC Action, Block sought coverage on the grounds that during the time the Policy was in effect Wholesale, which "share[s] a common ownership" with Block, was actually the party for whom Hartford assumed the risk because it, not Block, loaded and unloaded barges at the Terminal. Therefore, according to Block and Wholesale, because the Policy provided coverage "for damage to barges and cargo in the care and custody of the insured while at the Terminal," Wholesale, not Block, should be the name insured.

According to Block, although both it and Wholesale conduct business out of the

---

[2] The facts in the Background section are derived from the parties' Local Rule 56.1 statements and other pleadings. The facts in the Local Rule 56.1(a)(3) statements that the opposing party did not controvert in its Local Rule 56.1(b)(3)(A) statement are deemed admitted for purposes of this motion. Schultz v. Serfilco, Ltd., 965 F.2d 516, 519 (7th Cir. 1992). A "general denial" to the movant's statement will not suffice, the nonmovant "must cite specific evidentiary materials justifying the denial." Malec v. Sanford, 191 F.R.D. 581, 584 (N.D. Ill. 2000). Failure to comply with Local Rule 56.1 is not a "harmless technicality." Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 924 (7th Cir. 1994). Not complying with these requirements results in the admission of the movant's facts. The court is not required to scour the record to unearth material factual disputes or evidentiary support for a party's position. See, e.g., Carter v. Am. Oil Co., 139 F.3d 1158, 1162 (7th Cir. 1998).

Terminal, they operate "separate and distinct" lines of business. According to Janice Rose, the co-president of Block and Wholesale, "Wholesale runs the stevedore operation at the Terminal," which includes loading and unloading cargo from barges. The "primary function" of Block, on the other hand, "is to market and sell" the cargo, mostly road salt and tree bark, to third parties.

Hartford contests the above characterization of the operations of Wholesale and Block. After reviewing the pertinent portions of the parties' Rule 56.1 statements, this Court finds that the exact function of Wholesale and Block at the Terminal, during the time the Policy was written and in effect, is not clear from the record. Block's contention that Wholesale is a stevedore and that Block sells the cargo is based upon the affidavit of its co-president. At her deposition, however, the co-president testified that Block employed the dock manager and several stevedores at the Terminal and owned heavy equipment used in the loading and unloading of cargo at the Terminal.[3] Needless to say, if Block does not take part in the stevedore operations at the Terminal, it is unclear why it would employ dock workers and own stevedore equipment.

Additionally, as explained below, the broker for Block and Wholesale ("the Broker") allegedly told Hartford that Block, not Wholesale, unloaded all cargo at the Terminal, and that Wholesale was the owner of the cargo. Indeed, the initial application for insurance, completed by the Broker, sought stevedore coverage for both Block and Wholesale. These facts beg the

---

[3] Although Rule 56.1 permits citations to affidavits, the non-movant may not raise a disputed material fact "by submitting an affidavit containing conclusory allegations which contradict plain admissions in [a] prior deposition." See Adusumilli v. City of Chicago, 164 F.3d 353, 360 (7th Cir. 1998). "[W]here a deposition and affidavit are in conflict, the affidavit is to be disregarded" and the court should only consider the deposition, "unless it is demonstrat[ed] that the statement in the deposition was mistaken." Amadio v. Ford Motor Co., 238 F.3d 919, 926 (7th Cir. 2001).

question of why Block would need stevedore coverage if it was not a stevedore.

**The Instant Action**

After denying coverage, Hartford brought the instant action seeking a ruling that it does not have an obligation to insure Block or Wholesale for the damage to CC because: (1) Wholesale, the plaintiff in the CC Action, is not a "named insured" under the Policy; and (2) even if the Policy is reformed to include Wholesale, neither Block nor Wholesale gave notice of "the occurrence" "as soon as practicable" as required by the Policy. In its counterclaim, Block seeks reformation of the Policy to make Wholesale the named insured. Accordingly, in ruling on the parties' cross-motions for summary judgment, this Court will address the facts surrounding: (1) how the Policy came to be written; and (2) when Block/Wholesale received notice of the alleged damage to CC's barges.

**The Policy**

According to the co-president of Block and Wholesale, in 1997, Wholesale, through the Broker, sought to transfer its insurance coverage for stevedore operations at the Terminal to Hartford. Although Block and Wholesale claim that Wholesale was solely responsible for stevedoring at the Terminal, the initial application for coverage, placed in February of 1997 by the Broker, sought stevedore insurance for both Block and Wholesale.

Hartford denied this application in a letter dated May 6, 1997. Emma Carney, Hartford's "senior marine underwriter" at that time ("the Underwriter"), testified that this denial was based on two factors. One, the cargo unloaded at the Terminal included "bark mulch," which presents a risk of "spontaneous combustion." Second, because Wholesale owned the bark mulch being unloaded, Hartford was not willing to issue a stevedore policy covering cargo owned by the

stevedore – thereby presenting "liability unto themselves."

After the initial denial, the Broker allegedly informed the Underwriter that Block alone ran the stevedore operations at the Terminal. In light of the reasons for the previous denial – the risks associated with Wholesale and bark mulch – the Underwriter allegedly told the Broker that Hartford would "revisit insuring the terminal liability of Block only." The Underwriter testified that based on her conversations with the Broker, she understood that the coverage now sought was for Block, not Block and Wholesale or Wholesale alone. After reviewing the risks for Block alone, Hartford issued the Policy in May of 1997 with Block listed as the only named insured. The Broker renewed the Policy in 1998, 1999, 2000, and 2001, without any requests to change the name of the insured. Accordingly, Hartford asserts that it correctly named Block as the only insured in the Policy.

In response to the above facts, which are contained in Hartford's Local Rule 56.1 Statement of Additional Facts, Block states that it has "[i]nsufficient information to admit or deny [the Underwriter's] 'understanding' of which entity was to be provided coverage or as to the content of any communication she may have had with [the Broker]." Generally, stating that one does not have sufficient information to admit or deny a Local Rule 56.1 statement of fact constitutes an admission of that fact. See Unterreiner v. Volkswagen of America, Inc., 8 F.3d 1206, 1211 (7th Cir. 1993) (a party can not create a genuine issue of fact by simply disclaiming knowledge of undisputed testimony); Malec, 191 F.R.D. at 584 ( "general denial" to the movant's statement will not suffice: the nonmovant "must cite specific evidentiary materials justifying the denial" ). Therefore, this Court finds that it is undisputed that Hartford rightfully believed that it properly named Block as the "named insured" in the Policy.

The Court, however, finds that at this time it is not clear if Hartford actually believed that Block was the stevedore and Wholesale the sales entity. Because the Broker was not deposed and has not made an affidavit in this case nor have any written records from him been submitted, it is uncertain what the Broker was told by Block/Wholesale or what he stated to Hartford.[4]

Indeed, Block contends that it never told the Broker that it was the stevedore at the Terminal. As explained above, at this time the Court cannot say for certain what the actual responsibilities of Block and Wholesale were at the Terminal. If it turns out that Block only sells the cargo and Wholesale only unloads the cargo, then it would be much less likely that the Broker would have told Hartford otherwise.

In addition, a review of the Underwriter's deposition casts some doubt on whether Hartford actually believed that Block alone was responsible for stevedore operations.[5]

- A "loss control report" prepared by Hartford prior to issuing the Policy listed "A. Block Marketing D.B.A. Wholesale Mulch Products, Inc." (Carney Dep. at 45-48, Ex. E to Block's Local Rule 56.1 Statement.)[6]

---

[4] Given the importance of the Broker's alleged statements and knowledge of both sides' positions, it is hard to believe that neither side deposed him nor had him submit an affidavit. Moreover, the only statements attributable to the Broker are hearsay – statements he allegedly made to the Underwriter – and therefore are not sufficient to grant summary judgment. See Rogers v. City of Chicago, 320 F.3d 748, 751 (7th Cir. 2003). Block, however, has not objected to these alleged statements of fact in Hartford's Local Rule 56.1 Statement.

[5] The Court notes that Block did not put the following facts in its response to Hartford's assertion that it believed that Block was the stevedore at the Terminal. Generally, a court is not required to scour the record to find factual discrepancies. See, e.g., Carter, 139 F.3d at 1162. Here, however, after reading the Underwriter's deposition, it appears that there are facts, not cited by Block, which cast doubt on Hartford's belief regarding Block's role at the Terminal.

[6] Unfortunately, Block did not attach most of the documents marked as exhibits in the Underwriter's deposition. Therefore, this Court has only the description in the deposition of the documents which in many cases is very vague.

-6-

- In the "quote" offering insurance after the initial denial, Hartford wrote "A. Block Marketing, Inc. et al." and under a section titled "nature of business" wrote "Whole Sale Distributor [sic]." (Id. at 67-8.) When asked why this name was in the quote, the Underwriter testified that at that time both names (Block and Wholesale) were in "the system." (Id.) In a "revised quote," however, this information again appeared, in spite of the fact that the Underwriter testified that she had the ability to revise this information and that Hartford was only insuring Block for stevedore operations, not Wholesale. (Id. at 71-2.)

- In a letter from the Broker to the Underwriter regarding the "effective date of coverage," the Broker referred to coverage for both "A. Block Marketing, Inc. and Wholesale Mulch Products, Inc." (Id. at 75.)

- The Underwriter testified that she never received anything in writing from the Broker "that would indicate that Wholesale was not a stevedore operation." (Id. at 78.) Instead, her belief that only Block was a stevedore was "based on telephone conversations" she had with the Broker. (Id. at 76.)

- In submitting the necessary information to obtain coverage, the Broker gave Hartford a copy of a "Salt Handling and Storage Agreement," dated April 16, 1997, between Barge Terminal Trucking, Inc. and Wholesale. (Id. at 86-7 and Ex. F to Block's Local Rule 56.1 Statement.) This agreement states that Wholesale "shall receive, store and load out at the Terminal the salt which shall be subject to this Agreement." (Id.) To do this, Wholesale "shall have personnel at the Terminal to receive barges [and] make themselves available for unloading" and "shall provide and maintain equipment for the loading."

- The Underwriter testified that some of the policies she wrote for other insureds had to be reformed because of a misunderstanding between the parties and/or typographical errors in the policies. (Id. at 104-09, 117.)

Based on the above facts, this Court cannot find as an undisputed fact that Hartford believed that Block, and not Wholesale, performed the stevedore operations at the Terminal.

In sum, with regard to the Policy, this Court finds that there are material disputes of fact as to:(1) what the functions of Block and Wholesale are at the Terminal; and (2) whether Hartford actually believed that Block performed stevedore operations at the Terminal.

**The Alleged Damage to CC's Barge**

In the CC Action, which was filed on February 6, 2004, CC seeks damages from Wholesale and BTT for several barges that Wholesale allegedly damaged while unloading road salt at the Terminal on December 5 and 6, 2000. Block/Wholesale contend that they did not learn of the alleged damages to CC's barges until BTT's counsel sent a copy of CC's complaint to them in February 2004. After receiving a copy of the complaint, Block/Wholesale "immediately" tendered the claim to its broker, who then forwarded it to Hartford.

Hartford contends that Block/Wholesale had notice of CC's claim well before receiving a copy of the complaint in February 2004. In support of this assertion, Hartford cites to: (1) letters regarding the alleged damage to CC's barge which were mailed to and/or faxed to Terry Peterson, Block/Wholesale's dock manager at the Terminal ("the Dock Manager") in 2000-01; and (2) conversations which the Dock Manager had with Jack Edmier, the president of BTT.

- According to the deposition testimony of BTT's president, shortly after the barges were damaged, both he and the Dock Manager "personally viewed the barges" which were allegedly damaged. They, however, did not see any damage.

- After viewing the barges, on December 20, 2000, CC sent a letter to the Dock Manager at Block's corporate offices in Arlington Heights, Illinois, stating that CC's barges were damaged at the Terminal "as a result of [Block's] recent unloading" and that it "will look to A. Block Marketing, Inc. for recovery of all costs incurred."

- On January 18, 2001, CC sent a letter to the Dock Manager and BTT which stated that "[y]ou have both been previously placed on notice for damages connected with the unloading of barges . . . . We are now advising each of you the we do intend to have these barges bid out for repair and we do <u>intend to recover all costs associated with this matter from your firms</u>." (Emphasis Added.) The letter further stated that the barges were available for inspection and that "[w]e encourage both you and your insurance providers to take advantage of inspecting these barges prior to repair."

- Also, on January 18, 2001, CC faxed a "two-page Notice of Damage" to the Dock Manager at the correct fax number at Block's corporate offices. After the CC

-8-

employee (Michael Donze) sent this fax, he sent an internal e-mail to other CC employees stating that he had "faxed and called both parties connected to the damages of these barges and advised both of them that they have until 1800 9-19 to complete inspections and we do intend to come after them for repairs."

- On May 2, 2001, CC mailed another letter to the Dock Manager, at the correct address of Block's corporate offices, stating that CC "holds A. Block Marketing, Inc., responsible for all . . . damages to barges" that Block damaged while unloading at the Terminal. CC further stated again that the barges were available for inspection.

- The president of BTT testified that "[e]ach time BTT received a letter from [CC], [he] faxed a copy of the letter to [the Dock Manager] at the fax machine number at the [Terminal]." Among the letters faxed to the Dock Manager was a February 27, 2002, letter from CC giving BTT notice that CC was seeking a "claim" of $114,889.92 for damages to its barges.

- The president of BTT also testified that he discussed the contents of some of the above correspondences with the Dock Manager and the co-president of Block/Wholesale, Janice Rose.

In response to the above evidence, Block/Wholesale states that they will "neither admit nor deny" its accuracy. Instead, as explained below, Block/Wholesale contend that they never received these letters and that Hartford has not shown that they were properly sent. Accordingly, this Court will accept the contents of the above documents as uncontested facts. See Unterreiner., 8 F.3d at 1211; Malec, 191 F.R.D. at 584.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). See also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Cheek v. Western & Southern Life Ins. Co., 31 F.3d 497, 500 (7th Cir. 1994). A genuine issue of material fact is one that might affect the outcome of the lawsuit, and factual disputes that are

irrelevant will not be considered. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In determining whether a genuine issue of material fact exists, the court must construe the alleged facts in a light most favorable to the party opposing the motion. Dale v. Chicago Tribune Co., 797 F.2d 458, 460 (7th Cir. 1986).

The moving party carries the initial burden of establishing that no genuine issue of material fact exists. Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 323. Once the moving party has met its burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); Becker v. Tennenbaum Hill Assoc., Inc., 914 F.2d 107, 110 (7th Cir. 1990). The nonmoving party must do more than "show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), and may not merely rest upon the allegations or denials in its pleading, but instead must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248. If the evidence presented is "merely colorable" or is not "significantly probative," summary judgment may be granted. Id. at 250-51 (citations omitted). The court considers the record as a whole, and draws all reasonable inferences in the light most favorable to the nonmoving party. Regner v. City of Chicago, 789 F.2d 534, 536 (7th Cir. 1986).

**ANALYSIS**

The parties' cross-motions for summary judgment ask this Court to rule on two issues. One, whether the Policy should be reformed to include Wholesale as a named insured. Two, if reformation is appropriate, whether Block and/or Wholesale gave notice of CC's alleged damages "as soon as practicable" as required by the Policy. The Court will address each of these issues in turn.

**I.     Reformation of an Insurance Policy**

Under Illinois law, an insurance policy may be reformed where the parties intended to insure a particular risk but because of a "mutual mistake" or "unilateral mistake by one party and fraud by the other," the policy "does not properly reflect the intent of the parties." Gschwendter v. John Hancock Mut. Life Ins. Co., 1990 WL 186572, at *1 (N.D. Ill. Nov. 16, 1990). To reform a policy, the movant "must prove by clear and convincing evidence," id.,

> (1) the existence and substance of an agreement between the parties . . . ; (2) that the parties agreed to reduce the agreement to writing; (3) the substance of the written agreement; (4) that a variance exists between the parties' original agreement and the writing; and (5) mutual mistake or some other basis for reformation.

Schons v. Monarch Ins. Co. of Ohio, 574 N.E.2d 83, 86-87 (Ill. App. Ct. 1991).

Here, Block moves to reform the Policy on the grounds that: (1) the parties intended to provide coverage for the entity performing the stevedore operations at the Terminal; (2) Wholesale, not Block, is the stevedore at the Terminal; and (3) despite the parties' intention, through mutual mistake, Block instead of Wholesale was named as the insured under the Policy. Hartford contends that reformation is not proper in that: (1) it never intended to provide coverage for Wholesale because it believed that Wholesale owned the cargo and Block was the stevedore; (2) the Broker, Block's agent, intended to place coverage for Block only, and thus, there was not

mutual mistake.[7]

As detailed above, this Court finds that there are material disputes of fact as to:(1) what the functions of Block and Wholesale are at the Terminal[8]; and (2) whether Hartford actually believed that Block performed stevedore operations at the Terminal; and (3) what information the Broker actually relayed to Hartford. Therefore, because these facts are necessary to ruling on the legal issues for reformation, this Court DENIES the parties' motions on this issue.

## II. Notice Under the Policy

Hartford further contends that summary judgment is proper because, even if reformation is appropriate, Block and/or Wholesale failed to give notice of the CC's alleged damages "as soon as practicable" as required by the Policy. According to Hartford, Block/Wholesale did not give notice until February 2004, over three years after learning of the alleged damages. In response, Block/Wholesale contend that they did not learn of CC's claim until they received a copy of the complaint in February of 2004 and then immediately forwarded notice to Hartford.

When interpreting "as soon as practicable" notice provisions in insurance contracts, Illinois courts try to "weigh[] the desirability of compensation to the insured against the importance of the notice provision to the insurance company as a means of providing an opportunity to investigate the accident and protect itself against unjustified claims." American

---

[7] Hartford also raises a standing issue. As the named insured, Block clearly has standing to reform the Policy. See IBJ Schroder Bank & Trust Co. v. Cory Assocs., Inc., 1998 WL 765057, at *1-2 (N.D. Ill. Oct. 26, 1998) ("[r]eformation of a written instrument may be by the immediate parties thereto and by those standing in privity with them").

[8] Determining the exact functions of Block and Wholesale is important because assuming that Hartford intended to cover stevedore operations, the name on the Policy may not be of that much importance. See Anand v. GA Ins. Co. of New York, 643 N.Y.S.2d 661, 662-63 (N.Y. App. Div. 1996) ("the name of the insured in the policy is not always important if the intent to cover the risk is clear").

Country Ins. Co. v. Efficient Constr. Corp., 587 N.E.2d 1073, 1075 (Ill. App. Ct. 1992). Based on this rationale, Illinois courts require the insured to notify the insurer if it would appear to "a reasonable person <u>that a claim covered under the policy may be brought</u>." Id. (emphasis added). In so holding, Illinois courts decline to hold that the insured need only give notice if it appears that the insured "may be liable." Nat'l Bank of Bloomington v. Winstead Excavating of Bloomington, 419 N.E.2d 522, 524-25 (Ill. App. Ct. 1981).

Here, as detailed above, Hartford has submitted numerous letters and notices which were mailed and/or faxed to the Dock Manager. These documents clearly show that Block/Wholesale were given reasonable notice of CC's claim for damages as early as December of 2000. As such, a reasonable person in Hartford/Block's position would have known that there was a likelihood that a claim under the Policy may have been forthcoming.

In an attempt to get around this seemingly insurmountable hurdle, Block/Wholesale contend that they should not be credited as having received the above notices of damages because: (1) they deny having received them; (2) Hartford has not shown that they were properly sent; and (3) even if they were properly mailed/faxed, they were sent to the Dock Manager, so their content should not be attributed to Block/Wholesale.[9]

Illinois law presumes that an addressee received a letter when it is shown that the letter was placed in a properly addressed envelope, with the correct postage, and deposited in the mail. Kent Meters, Inc. v. Emcol of Illinois, Inc., 768 F. Supp. 242, 244 (N.D. Ill. 1991). The person

---

[9] Block/Wholesale also contend that even if they had notice of CC's potential claim, they did not have an obligation to give Hartford notice because the Dock Manager did not see any damage when he viewed the barges. The standard for when an insured is required to give notice regarding an occurrence, however, is whether a claim may be brought, not whether the insured may be liable. Accordingly, this contention fails.

-13-

who actually mailed the letter need not provide direct testimony "if corroborating circumstances, such as telephone confirmation of the notice was received." Id.

Here, there was both direct evidence of the letters being properly mailed and sufficient corroborating evidence for this Court to find that Block/Wholesale had notice of CC's claim well before receiving a copy of the complaint in February of 2004. Michael Donze, the risk manager at CC, testified that with regard to the December 20, 2000 and May 2, 2000, letters, he typed them, prepared the envelopes with the proper address,[10] and then placed them in CC's "in-house mail routing system." He also testified that he prepared the January 18, 2001, fax cover sheet and faxed it to the correct fax number for Block/Wholesale.

While the above assertions appear sufficient to show that CC properly mailed the letters and sent the fax, Hartford points to several pieces of corroborating evidence. For example, in an e-mail to other CC employees, the risk manager wrote that he had "faxed and called both parties connected to the damages of these barges and advised both of them that they have until 9-19 to complete inspections and we do intend to come after them for repairs." Furthermore, the president of BTT testified that he discussed the contents of some of the above correspondences with the Dock Manager and the co-president of Block/Wholesale, Janice Rose.

This Court thus finds that Hartford has put forth sufficient facts to warrant a presumption that Block/Wholesale received the above letters and the fax, which detailed CC's claim for damages and provided reasonable notice that CC may bring a claim. The fact that these notices were sent to the Dock Manager does not change these facts. Block/Wholesale cannot avoid the presumption that they had knowledge of CC's claim by simply asserting, without presenting any

---

[10] Block/Wholesale do not contest that CC put the correct address on the letters.

evidence, that the Dock Manager, who no longer works for them and has not provided any direct evidence, did not forward these notices to anyone else at Block/Wholesale.

Accordingly, given that Block/Wholesale had reasonable notice that CC would likely bring a claim for the damages to its barges, this Court holds that Block/Wholesale breached the "as soon as practicable" notice provision of the Policy.[11] This Court thus GRANTS Hartford's Motion for Summary Judgment and finds that there is no coverage under the Policy for the damage to CC's barges.

---

[11] Because Hartford did not receive notice of the claim until well after CC had repaired the barges, it was not able to follow its standard procedure of having a marine surveyor investigate the alleged damage by inspecting the vessel.

## CONCLUSION

      For the foregoing reasons, the Court GRANTS Plaintiff/Counter-Defendant Hartford Fire Insurance Co.' Motion for Summary Judgment [28-1] and DENIES Defendant/Counter-Plaintiff A. Block Marketing, Inc.'s Cross Motion for Summary Judgment [22-1]. It is so ordered.

**ENTER:**            *[signature]*
                                  **BLANCHE M. MANNING**
                                  **U.S. DISTRICT COURT JUDGE**

**DATED: 8/2/05**